Burton B. Roberts, J.
On August 30,1971, the Acting District Attorney of New York County obtained court authorization to wiretap and ‘ ‘ bug ’ ’ the apartment residence of Anthony Salerno and Joseph Moretti at 32 Gramercy Park South, Manhattan. This warrant was the first in a continuous series of eavesdropping orders for a succession of locations frequented by Salerno, Moretti and others allegedly associated with them. Conversations overheard after six months at the apartment were used to obtain warrants for eavesdropping which continued for the next six months at the Dunhill Barber Shop, which, in turn, led to the following two and one half months of interceptions in a back room of the barber shop which had been converted into an office of the so-called Merit Commercial Corporation.
Communications of the defendants intercepted as a result of this electronic surveillance resulted in the instant indictment *779 charging them with a conspiracy to commit usury.[1] The defendants now move to suppress any evidence against them derived from illegal eavesdropping. While also raising defects of a more technical nature in several of the warrants, they make their main attack upon the sufficiency of the probable cause for the progenitor of the series, the order of August 30.
The District Attorney, of course, contends that this and each of the warrants in the series were adequately founded. In the alternative, the prosecution maintains that the defendant Brown lacks “ standing ” to object to the August 30 order inasmuch as his communications were not intercepted until eavesdropping had shifted to the barber shop. The barber shop warrants, it is claimed, were based upon probable cause acquired from the communications of coconspirators to which, the People theorize, the defendant Brown cannot object in view of Alderman v. United States (394 U. S. 165). (A similar argument with respect to the defendant Stein, who was first overheard at the apartment five months after the eavesdropping was begun there, is conceivable but not advanced. The defendant Bailante was first overheard pursuant to the August 30 warrant. His standing to object to it is beyond dispute. (See Alderman v. United States, supra.) The defendant Brown maintains that since his voice was overheard he has all the (Standing that is required and may challenge the warrants under which. he was intercepted by attacking the series to its source, the August 30 warrant.
Since I find, for reasons indicated below, that the initial order did indeed lack probable cause, the case of the defendant Brown then raises the novel issue of whether the standing doctrine applies in the context presented to prevent him from attacking its deficiency. (It is not necessary to reach the unraised similar issue in the defendant Stein’s case since, as will shortly be demonstrated, the renewed warrants for the apartment pursuant to which he was overheard were, like the original, not based upon any manner of probable cause.)
A review of the factual basis for the various warrants, commencing with that of August 30, is set forth below.
The initial application for eavesdropping at the apartment was based upon affidavits by a detective and a then Assistant District Attorney who supervised the investigation. The latter con- *780 eluded, based upon the two months of police observations recited by the former, that eavesdropping at the apartment on Salerno, Moretti and ‘ ‘ their confederates ’ ’ would reveal ‘ ‘ essential evidence ” of “ organized criminal activities involving bookmaking [and] policy ’ ’. Underlying this conclusion, however, is an appallingly weak evidentiary showing, embellished by an assortment of unsupported, subjective characterizations and interpretations which merely create illusions of probable cause that the unadorned facts cannot justify.
What is purportedly the most significant evidence in support of the application are several observations of Salerno and Moretti on the street near the Dunhill Barber .Shop during daylight hours conversing with various other individuals and, in a few instances, receiving a piece of paper from them. From an objective (standpoint, these are activities which would, in all probability, have failed to sustain the minimal constitutional intrusion posed by a police officer’s temporary detention of the actors for inquiry (CPL 140.50; see Terry v. Ohio, 392 U. S. 1), not to mention an outright invasion by electronic surveillance of their residence. Objectivity, needless to say, is dealt some staggering blows en route to the conclusion that these observations establish probable cause to believe that Salerno and Moretti were conducting “ an organized gambling enterprise ” outside the Dunhill. The application relates, for example, that Moretti is “ known to the police ” as a “front” for Salerno’s illegal activities; that the barber shop is known (based upon some unspecified “past police investigations”) to be “a meeting place for men engaged in organized criminal activities ”; and that several men observed standing with Salerno are ranked as “national figures ” in organized crime gambling operations. The coup de grace, however, is that the pieces of paper are simply decreed, sight unseen, to have contained “ shorthand notations * * * used by gamblers to note betting and layoff transactions.”
The alleged nexus of any criminal activity to the apartment was more fanciful still. Several reported observations concerned the occasional delivery to the residence by Salerno and others of bags and packages, the contents of which were peither seen nor otherwise apparent. Nondescript, such items could, conceivably, have concealed anything from fruitcakes to kilos of heroin. They had no probable cause value. (People v. Corrado, 22 N Y 2d 308.) Nevertheless, they are declared, through the alchemy of “ police experience ”, to be “ the method used by organized crime gamblers to control their operations *781 and obtain a routine accounting from their subordinates.” “ Conversations in the Salerno apartment,” it is therefore concluded, “ will clearly reveal evidence of gambling slips and discuss the day to day operation of their unlawful activities.”
The Fourth Amendment, as it relates to eavesdropping, requires that probable cause must exist to believe that a specific crime has been or is being committed and that particularly described conversations constituting evidence of that crime will be obtained through electronic surveillance at a specific location. (Berger v. New York, 388 U. S. 41.) “ Probable cause ”, according to Berger, “ exists where the facts and circumstances within the affiant’s knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe than an offense has been or is being committed ’ ’ (id., p. 55). The August 30 application falls distressingly short of these requirements. Its factual showing justifies nothing but the most general suspicion that Salerno and Moretti were engaged in something illegal. (Cf., e.g., People v. Gnozzo, 31 N Y 2d 134; People v. Feinlowitz, 29 N Y 2d 176.) The facts “ unto themselves ” bear little, if any, observable connection to organized gambling or to communication emanating from the G-ramercy Park apartment. There is, to be sure, nothing in the law prohibiting an application for an eavesdropping or other warrant from suggesting to the issuing Justice reasonable inferences drawn from observable facts. And an expert opinion, properly qualified and with sufficient basis in fact, may itself become a fact establishing an element of probable cause (People v. Valentine, 17 N Y 2d 128). But the inferences and opinions upon which this application is based are not only barren of support, they are unsupportable. Indeed, it is disturbing to think of the myriad of equivocal acts by innocent citizens subject to being transformed into “ probable cause ” for eavesdropping by the kind of police “knowledge” and ‘[1] expertise ’ ’ that were so casually dispensed here.
The District Attorney has informed the court in response to an inquiry that the defendant Bailante, who did not become a named party until a subsequent order for the apartment dated November 10,1971, was first intercepted pursuant to the August 30 warrant. Thus, he has standing to object to this warrant, which is invalid for lack of probable cause, and any further eavesdropping tainted by it. (Wong Sun v. United States, 373 U. S. 471.) His motion to suppress, therefore, must be granted.
On October 9,1971 an order was obtained to continue electronic surveillance at the apartment for another 30-day period. Several *782 conversations intercepted pursuant to the first order were detailed in the application as the purported justification for the renewal. All of these interceptions were exceedingly brief and none had any discernible relationship to any crime. Indeed, the application itself alleged only one excerpt from one conversation to have any significance with regard to the specific .subject matter under investigation. This excerpt, which is set forth in the margin,[2] was so lacking in context as to be subject to innumerable interpretations. By itself it cannot be said to have constituted probable cause for anything.
It is clear that the renewal of an electronic surveillance warrant must be based upon a showing of ‘1 present probable cause ” for the eavesdropping to continue. Mere reliance on the original grounds on which the order was initially issued as the basis of the renewal is insufficient. (Berger v. New York, 388 U. S. 41, 59, supra.) Bather than demonstrating “present probable cause ” the profitless interceptions offered in support of the renewal refute the entire basis for the first application. Nevertheless, the eavesdropping continued.
On November 10[3] and December 10,1971 and January 8,1972, the electronic surveillance was extended for additional 30-day periods. Newly-intercepted communications set forth in support *783 of these renewal applications failed in each case to provide the requisite probable cause. Most of the conversations purportedly dealing with gambling crimes were brief and cryptic messages relating to forthcoming meetings between the parties, the precise nature of which was apparently understood by them but not revealed. Several of the excerpts recited were nothing more than statements referring to football games in a context normally associated with a casual bettor or fan. Others dealt with the most mundane matters that could not possibly have had any relationship to illegal activities. All of these were, nevertheless, interpreted without justification as evidence supporting the continuance of the eavesdropping. Indeed, some of these interpretations were so hopelessly contrived as to be almost laughable. For example, an attorney who was intercepted telling Salerno ‘ ‘ I got that new policy and I want to talk to you about it ” is, according to the application, making coded reference to “ Parimutuel Race Horse Policy
A few of the conversations intercepted also dealt, quite obviously, with the collection of loans. While it is questionable that they provided probable cause with respect to the crime of usury, it is worthy of note that the application does not even attempt to so attribute them or amend to include them. Apparently trapped by their own creation, the investigators alleged without foundation that these communications related to the enforcement of gambling debts, and gambling remained the subject matter of the warrants.
The District Attorney has informed the court in response to an inquiry that the defendant Stein, who did not become a named party until a subsequent eavesdropping order for the office of the- Merit Commercial Corporation, was first intercepted pursuant to the order of January 8. Thus, he has standing to object to this order, which is invalid for lack of probable cause, and any further eavesdropping derived from it. His motion to suppress must also be granted.
On February 9, 1972 the District Attorney applied for and received the sixth and last authorization for eavesdropping at the Gramercy Park apartment. A conversation between Salerno, Moretti and the defendant Bailante intercepted on February 2, 1972, which was set forth in support of this order, revealed the existence of a plan to have borrowers in an apparently ongoing money-lending operation call the Dunhill Barber Shop to arrange for loans. The conversation was nevertheless interpreted by the affiant to refer to a gambling enterprise, and the *784 scope of the warrant was not amended. Probable cause for the only crime specified in the order had still not been established.
On February 24, 1972 a 30-day eavesdropping order was obtained for two telephones at the Dunhill Barber Shop naming Salerno, Moretti and the defendant Bailante. The showing of probable cause consisted of the observations and conclusions concerning the activities outside the barber shop iset forth in the original application plus the February 2 conversation. The scope of the warrant, however, was again for gambling.
On March 28,1972 wiretapping at the barber shop was renewed for another 30 days. This renewal contained an amendment, which, for the first time, authorized the interception of conversations pertaining to criminal usury in addition to gambling crimes. The amendment also designated one “ Pat ” Avitabile along with Salerno, Moretti and the defendant Bailante as the parties named in the warrant. Intercepted conversations in the barber shop set forth in support of the renewed authorization substantiated the existence of a money-lending scheme, the day-to-day operations of which were apparently conducted by Avitabile, who was overheard speaking directly to borrowers, arranging loans and demanding payment. It should be noted, parenthetically, that none of the conversations set forth in the application concerned gambling activity.
Eavesdropping at the barber .shop as previously amended continued uninterrupted under various court orders for the next five months, during which time a ‘ ‘ bugging ’ ’ device was installed in the premises and the wiretapping discontinued. Each of these orders was based upon a sufficient showing of “ present probable cause ” derived from previous interceptions. On July 17, 1972, the defendant Brown was overheard for the first time, conversing with Salerno. On subsequent days he was intercepted in conversations with the defendants Bailante and Stein, discussing the alteration of a back room of the barber shop into a check-cashing business (the Merit Commercial Corporation) which would, in reality, be an office for the transaction of usurious loans. Based upon these conversations, authorization was obtained to install an eavesdropping device in the back room. This order was renewed for two additional 30-day periods and finally expired on October 16,1972. Conversations of Brown thus intercepted constitute the basis for the instant indictment.
To repeat, the issue in the case of the defendant Brown is whether he is permitted to raise the illegality of the orders for the Gramercy Park apartment, where his voice was never intercepted, as the basis for the warrant for the Dunhill Barber *785 Shop, pursuant to which he was overheard in conversation with Salerno on July 17,1972. Both sides rely on Alderman v. United States (394 U. S. 165, supra), for their respective position.
In Alderman, the petitioners had discovered, while their appeal was pending in the Supreme Court, that one or more of them had been the subject of electronic surveillance which was apparently illegal and which might have tainted their conspiracy convictions. The court, in remanding the case to the District Court to determine who had been overheard and what bearing the interceptions may have had upon the evidence supporting the convictions, rejected the petitioners’ argument that “ if evidence is inadmissable against one defendant or conspirator, because tainted by electronic surveillance illegal as to him, it is also inadmissable against his codefendant or coconspirator ” (394 IT. S. 165, 171). Instead, the Justices applied to eavesdropping 11 the general rule that Fourth Amendment rights are personal rights which * '* * may not be vicariously asserted. ’ ’ (Id., p. 174; Jones v. United States, 362 U. S. 257.) ‘ ‘ The established principle ”, the court stated, “ is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those aggrieved solely by the introduction of damaging evidence.” (394 U. S. 165, 171-172.) The court then proceeded to hold that only the “ victim ” of the illegal electronic surveillance — defined as someone whose conversations bad been overheard or whose premises had been the subject of the eavesdropping— had standing to object to its use. (Id., p. 176.)
It should be clear from the foregoing that the only standing defined by Alderman is a procedural prerequisite to an objection to the ultimate introduction of illegally obtained evidence at the trial. The standing doctrine in general is the procedural embodiment of the balance struck between the personal character of Fourth Amendment rights and the deterrent aims of the exclusionary rule (394 U. S. 165, 174—175). It requires, as a predicate to exclusion, that one who objects to a constitutional violation be someone who has been personally affected by it to an extent greater than by the mere ultimate introduction of its fruits against him at the trial. Once this threshold requirement has been met (as it has when someone’s conversations have been seized) standing, at least as enunciated in Alderman, has no other application. Its use as a substantive rule which permits illegally obtained eavesdropping to be cleansed when the defects are eliminated before new victims appear was not contemplated by the court in Alderman.
*786 Put another way, Alderman merely holds that a person who has been overheard has standing to object and does not deal with the question of what a person who has been overheard as a result of previous illegal eavesdropping may base his objection upon. Two recent cases indicate that the answer to this question must be decided not on further requirements on the order of standing, but upon ,an ad hoc determination, considering the nature and magnitude of the illegality of the source, its relationship to the eavesdropping on which the defendant has been intercepted, and the goals of the exclusionary rule. In United States v. Gibson (500 F. 2d 854) the defendant, who was overheard on a derivative wiretap, based his attack upon the insufficiency of the original order, which was defective under United States v. Giordano (416 U. S. 562), in that it was signed by the Executive Assistant to the Attorney General rather than the Attorney General himself. The court, in affirming the order of the District Court denying the defendant’s motion to suppress, added a caveat: ‘ ‘ Here, however, we deal not with fundamental constitutional rights, but with' a technical procedural error in the Department of Justice which was readily correetible had its presence been recognized. It is not such a .source of infection that one so remote as Gibson from it should be given standing to suppress information from later taps upon the telephones of others as a result of proceedings in the Department of Justice which were not procedurally defective. If, in some circumstances, protection of important constitutional rights or the inhibition of police misconduct may require suppression of the ‘ fruit of the poisonous tree,’ this is not such a case.” (500 F. 2d 854, 855; but, cf., State v. Cocuzza, 123 N. J. Super. 14.) More outspoken is People v. Koutnik (44 A D 2d 48), in which the appellants had been overheard during various stages of a long-range eavesdropping investigation that employed some 107 warrants, the first of which the court held to be “ patently deficient”. After noting that “a complicating factor is that not all defendants have standing to attack all of the orders ” (id., p. 51), the court found that suppression should nevertheless be granted to all of them because ‘‘ each subsequent order is predicated on information obtained from previously authorized interceptions, and are so intertwined and interrelated as to cast a shadow upon the entire investigation.” (Id., p. 53.)
In the instant case, the history of the August 30 warrant and its renewals demonstrate a pattern of illegality, not merely technical in nature, amounting to a clear abuse of the power and responsibility granted to law enforcement officers under the *787 eavesdropping ¡statutes. As a result of this clear violation of the Constitution an eavesdropping foothold was established and maintained for months without probable cause until it directly produced the sole basis for eavesdropping upon the same individuals at another location, where the defendant Brown was later overheard. To hold that Brown cannot attack his own interception on this basis without first demonstrating additional “ standing ” to object to the illegality of its source would intolerably undermine the deterrent ,aim of the exclusionary rule and its companion principle that the State must not be permitted to profit from its own illegality (Mapp v. Ohio, 367 U. S. 643). Such a holding would encourage Fourth Amendment violations which, though suppressible by some, could nevertheless ensnare others whoise timing — and the legalism of standing — would preclude them from objecting. It would reward illegality in proportion to its duration and expansion. Such result would be unconscionable.
For the foregoing reasons, the motions to suppress of all three of the defendants herein are granted.

. Salerno was indicted separately for conspiracy to commit usury (indictment No. 2846/73), with these defendants and others named as his eoeonspirators. Moretti was one of several individuals indicted for contempt allegedly committed before a .grand jury inquiring into matters revealed by the investigation (indictment No. 2622/73).

. The entry in the application containing this excerpt reads as follows:
“ On September 23, 1971, the following conversation was overheard between Joseph Moretti and Anthony Salerno, and another.
“Moretti: I told him to give me the money — now keep quiet, I’m going to give you the money.
“ Salerno: This fucking guy is crazy.
“Male: What did Joe when you went to him?
“ Salerno: I said, ‘ I didn’t see you give him nothin ’. If I give him 5, would you give him 10? —
“Male: [Salerno]: If you give him 20, I’ll give 40. If you give him 40, I’ll give him 80, 800.
This conversation relates to the passage of moneys in the subject’s illegal gambling operation.”

. The November 10 renewal order contained an amendment, which was both retrospective and prospective in its application, authorizing the investigators to have overheard (pursuant to the previous warrant) and to continue to intercept conversations relative to the crimes of murder and assault. The basis for the amendment consisted of two brief excerpts of conversations dealing at least on their face, with physical violence. While these excerpts would have been preservable for use by amendment pursuant to CPL 700.65 had they been intercepted under a valid order, they lacked sufficient context to provide probable cause necessary for an amendment authorizing the interception of future conversations of the same ilk. (Cf. People v. Di Stefano, 45 A D 2d 56, 60.) The issue, however, is an academic one inasmuch as the orders amended were basically invalid. It should also be noted that no further conversations dealing with the same subject matter were obtained under any of the subsequent orders.