**UNITED STATES**

v.

**Louis OSTRER, Defendant.**

**No. 71 Cr. 558.**

United States District Court, S. D. New York.

June 4, 1976.

Robert B. Fiske, Jr., U.S. Atty., S.D.N.Y. by Lawrence Pedowitz, Gregory L. Diskant, Asst. U.S. Attys., New York City, for plaintiff.

Alan Dershowitz, Cambridge, Mass., Harvey A. Silverglate, Ann Lambert Greenblatt, of Silverglate, Shapiro & Gertner, Boston, Mass., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING HEARING ON MOTION PURSUANT TO RULE 33, F.R.CRIM.P.

BRIEANT, District Judge.

On January 26, 1973, after a three-week jury trial before Chief Judge Edelstein of this Court, defendant Ostrer was found guilty on eleven counts which charged him with violation of various provisions of the federal securities laws, mail fraud and conspiracy so to do.[1] The trial court acquitted Ostrer of twenty-three counts upon motion, and the jury acquitted him on the six remaining counts in this forty count indictment. The conviction was affirmed on appeal *sub nom. United States v. Dioguardi,* 492 F.2d 70 (2d Cir.), *cert. denied,* 419 U.S. 829, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974).

Following the conclusion of his trial on these charges, Ostrer was arrested and indicted on unrelated state charges. In 1975, Ostrer's state indictment was dismissed when it became evident that the state's prosecution was founded upon electronic surveillance conducted pursuant to court orders, which, in turn, relied for their issuance upon the use of evidence later found to be tainted.

Ostrer now moves pursuant to Rule 33, F.R.Crim.P. for a new trial on these federal charges, based on newly discovered evidence, claiming that he was deprived of a fair trial and that his Fourth and Sixth Amendment rights were violated. An evidentiary hearing was held, during the course of which tapes of the electronic surveillance were received. For the reasons stated herein, defendant's motion for a new trial is denied.

■ Initially, we reject the Government's contention that defendant's instant motion pursuant to Rule 33, F.R.Crim.P. for a new trial should be treated by this Court as an independent action pursuant to 28 U.S.C. § 2255 in the nature of a collateral attack upon the judgment of conviction. The issues raised are properly before this Court as a motion based on newly discovered evidence, since the fact of the state's electronic surveillance and the extent of its claimed intrusion upon his rights were unknown to him at the time of trial. Although the issues raised here constitute an attack on the judgments of conviction on constitutional grounds, which would be cognizable also in a § 2255 action, there is a substantial overlap between the relief available pursuant to Rule 33 in the original criminal proceeding, and that available in a § 2255 action. See 2 Wright, Federal Practice and Procedure § 552 (1969). Defendant may elect to raise these issues, as he has done here, by motion for post-trial relief based on newly discovered evidence. In so doing, defendant assumes the burdens traditional-

---

1. In addition to the conspiracy charge, Ostrer was convicted of the substantive crimes of (1) causing a sale confirmation for stock of Belmont Franchising Corporation to be placed in the mail in furtherance of a fraudulent scheme for the sale of stock, in violation of 15 U.S.C. §§ 77q(a), 77x; (2) causing purchase confirmations for such stock to be placed in the mail as part of a manipulative device in connection with the purchase or sale of a security in violation of 15 U.S.C. §§ 78j(b), 78ff and Rule 10b–5, 17 C.F.R. § 240.10b–5; and (3) use of the mails as part of a scheme to defraud in violation of 18 U.S.C. § 1341.

ly imposed on a defendant seeking such relief. See *United States v. Slutsky,* 514 F.2d 1222 (2d Cir. 1975). It must be observed that a court will not lightly refashion litigation seeking post-conviction relief. See *United States v. Huss,* 520 F.2d 598 (2d Cir. 1975). Where relief may be available under either Rule 33 or § 2255, defendant should be permitted to litigate the issues in such form as he chooses.

Accordingly, we proceed to a consideration of the merits of the issues as framed by the defendant in his motion.

### The Unlawful Electronic Surveillance.

On October 25, 1972, while Ostrer was awaiting trial under this federal indictment,[2] New York City police officers assigned to the Rackets Bureau of the Office of the District Attorney, New York County (hereinafter "D.A.'s Office") began electronic surveillance of Ostrer at premises leased to Fringe Programs, Inc. and Louis C. Ostrer Associates, at 377 Fifth Avenue in this City. The surveillance was authorized initially by orders of Justice Harold Birns of the Supreme Court of the State of New York, New York County, signed October 24, 1972. The D.A.'s investigation, at this time, was directed at obtaining evidence of suspected violations of the state's criminal usury law.

The surveillance "monitoring plant" was staffed solely by New York City police officers on assignment to the D.A.'s Office, and not by federal law enforcement personnel. These police officers would eavesdrop, using bugging and telephone wiretapping devices, and would record selectively those conversations which they deemed relevant to their investigation. Most other conversations were summarized in written "plant reports" maintained by the surveilling officers. Pursuant to instructions of the District Attorney, and in order to preserve security, all such reports were made solely to persons affiliated with the D.A.'s Office and directly concerned with the investigation.

The orders authorizing the surveillance were renewed upon the order of Justice Birns, signed on November 22, 1972.

Among the conversations memorialized on tape or summarized in the written plant reports, are several in which the impending federal trial is mentioned, and matters pertaining to it are discussed. In these conversations, Ostrer and several of his associates discuss pre-trial developments in the federal case. Participants in these conversations include various associates of Ostrer, among them Julius November whose relationship with Ostrer will be discussed further *infra,* pp. 96–97.

Among the more significant topics discussed were, (1) whether Ostrer should seek a trial severance from his co-defendant John Dioguardi; (2) whether Ostrer should waive his right to a jury trial and testify in his own behalf; (3) the likely impact of Ostrer's testimony, considered in light of disclosure on cross-examination of his prior state felony conviction as impeachment; and (4) the tactical value of having Ostrer introduce certain cancelled checks.[3] Also mentioned was the name of Ostrer's private investigator, one James Lynch, formerly of the Federal Bureau of Investigation. None of the conversations were with Maurice Edelbaum, Esq., then Ostrer's counsel of record in the federal case, but at times the conversations included discussion by others with Ostrer of Mr. Edelbaum's comments and advice.

These conversations cannot properly be characterized as defense strategy sessions. News of pre-trial developments was discussed and treated conversationally, as a current development in the life of Ostrer, much the same as any other important event might have been treated or considered. In numerous conversations, no attorney is present, and, in some, Ostrer is

---

2. This indictment was filed on May 27, 1971. On June 1, 1971 Ostrer was arraigned and pleaded not guilty.

3. In one intercepted telephone conversation regarding these checks, Ostrer misrepresents himself as being an attorney named Mr. Levine, associated with the law firm of Julius November.

only an occasional participant. The tenor of these conversations varies, ranging in intensity from casual conversation to shouting bouts. Taken separately or together, except for those noted below, the conversations are of little significance.

*The November 21 and 30, 1972 Conversations.*

On November 21, 1972, the surveilling officers overheard and recorded a conversation between Ostrer, William Kilroy and Julius November.

November is a New York attorney admitted to practice in this Court. He is a long standing friend and business associate of Ostrer. Since 1962 or 1963, November has represented Ostrer in various non-criminal matters, including civil litigation. Ostrer's trial counsel, Mr. Edelbaum, conferred with November on occasion prior to trial.

At trial, November was a spectator, who occasionally walked over to the defense counsel table during court recesses. He did not appear as an attorney.

 We are persuaded that during the course of pre-trial preparation, Ostrer reasonably believed that November was extending legal counsel, rather than friendly advice. The testimonial privilege against disclosure of attorney-client communications is applicable where the client entertains good faith beliefs (even if erroneous) that the person consulted is a lawyer, *and* is acting as such on his behalf. Wigmore on Evidence, § 2302 (McNaughton rev.). Here, there is no doubt that November was an attorney, and that Ostrer knew that was his profession. In this context, we are concerned with more than a testimonial privilege. We are concerned with safeguarding

a criminal defendant's constitutional rights to a fair trial and the effective assistance of counsel. We therefore conclude that, for purposes of this motion, November was acting as an attorney for Ostrer. *Cf. United States v. Scott,* 521 F.2d 1188 (9th Cir. 1975).

The November 21st conversation, which began with a discussion of certain loans owed by the participants, soon degenerated into a shouting match between Ostrer and November, liberally sprinkled with obscenities. November then showed Ostrer a typewritten statement he had prepared, signed by Susan Gold, an employee in Ostrer's office, and dated November 21, 1972 (Exhibit BB).[4] A discussion ensued concerning the contents of the statement and the use to which it could be put. From the conversation an eavesdropper could infer that the statement disclosed that Aubrey Moss, a married man whom Ostrer and November believed would be a Government witness in this case, was having an adulterous affair with Miss Gold.[5]

November suggested that Miss Gold's statement was so potent and would tend to discredit Moss' reputation to such a degree that Moss could not afford to take the stand and risk its disclosure. November also suggested that Gold would be available as a witness to impeach Moss' credibility if he did take the stand, and that her written statement would be valuable if Gold were to recant. November advised Ostrer not to give his trial counsel, Mr. Edelbaum, a copy of the Gold statement, but to retain it for later use. Ostrer questioned November whether this was blackmail or intimidation of a witness and November assured him that it was not.

---

4. Unless otherwise indicated, all reference to exhibit numbers are to exhibits introduced at the evidentiary hearing upon this post-trial motion.

5. The Government did not obtain Gold's statement (Ex. BB) until after the verdict was returned in this case. The statement was provided to the United States Attorney by state law enforcement authorities who seized the statement in a search of Ostrer's office on February 21, 1973. This search was conducted pursuant

to state warrant, but the warrant was issued based upon information obtained through the unlawful electronic surveillance. For purpose of our inquiry here, what is relevant is what was known prior to conclusion of the federal trial; necessarily, this is limited to the conversations overheard by the electronic surveillance, to the extent disclosed to the federal prosecutor, and does not include the Gold statement document itself.

November testified that he had never tried a criminal case in federal court. I believe this to be true. Attorneys familiar with federal practice in criminal cases would realize the unavailability of this information for impeachment purposes. Indeed, Mr. Edelbaum testified (Tr. pp. 358, et seq.) that, under the then prevailing rulings on evidence, he did not believe that an accusation of adultery could be used in this District to impeach a witness. In this he was correct.

While Rule 608(b), F.R.Evid. might suggest a different rule, at the time of Ostrer's trial the rule was as explained in *United States v. Semensohn,* 421 F.2d 1206, 1208 (2d Cir. 1970):

"It is settled that in a trial a witness's acts of misconduct are not admissible to impeach his credibility unless the acts resulted in the obtaining of a conviction. It is also settled law that a conviction does not become a final conviction until sentence has been imposed and until the time for an appeal from the judgment has expired."

There are many cases to the same effect. They include *United States v. Nuccio,* 373 F.2d 168, 171 (2d Cir.), *cert. denied* 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967), affirming a conviction where defendant was precluded from cross-examining a witness as to homosexuality to impeach credibility. The Court held:

"Weighed against the rather slight probative value, the adverse effect of such evidence in improperly discrediting and embarrassing the witness justified the trial court in excluding it. See 3 Wigmore, Evid. § 951 (1940 ed.)."

See also, *United States v. DeSapio,* 456 F.2d 644 (2d Cir.), *cert. denied* 406 U.S. 933, 92 S.Ct. 1776, 32 L.Ed.2d 135 (1972), [witness Itkin's subornation of perjury, absent a conviction, not admissible for impeachment of general credibility]; *United States v. Bowe,* 360 F.2d 1 (2d Cir.), *cert. denied* 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966), [witness called to testify that chief Government witness asked him to participate in plan to blow up Statue of Liberty]; *United*

*States v. Glasser,* 443 F.2d 994 (2d Cir.), *cert. denied* 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971), [prior criminal acts not resulting in a conviction may not be made the subject of direct proof]. In sum, we believe, with Edelbaum, that the trial judge would have precluded any inquiry on cross-examination as to Moss' adulterous relationship with Gold, and are certain that any direct proof, through testimony of Gold as to that misconduct would have been excluded. If the possible coercion inherent in delivery of Gold's statement to Moss' wife or children would have inhibited Moss, the prosecutor had adequate counter forces, including the power to confer use immunity on Moss (18 U.S.C. § 6001, et seq.), and compel him to testify truthfully by the power of civil contempt, and the threat of prosecution for false statements. 18 U.S.C. § 1623.

Even under the more liberal New York state practice, where such inquiry of the witness would be permitted for impeachment on cross-examination, instances of prior misconduct are collateral matters not provable by extrinsic evidence. See *People v. Webster,* 139 N.Y. 73, 83–85, 34 N.E. 730, (1893); Richardson on Evidence, § 510 (9th ed.).

Lastly, what good is the Gold statement? In these times of recorded and widely publicized Presidential and Congressional adulterers, massage parlors with neon signs, and street corner pandering, which claims constitutional protection, we suspect that many of our jurors selected within a fifty mile radius of Foley Square are licentious, or have friends who are. Moss neither raped nor seduced Miss Gold; the activities of these mature consenting adults would not, in our view, if known to the jury, impeach any witness. November cannot realistically have believed otherwise.

Subsequently, in a recorded telephone conversation on November 30, 1972, from Ostrer's office, Susan Gold told Moss that she did not want to "see" him until the federal trial was concluded. Miss Gold accused Moss of turning unfairly against his

friend Ostrer, and a discussion of financial losses that Moss had suffered in transactions with Ostrer ensued. Toward the end of this conversation, Ostrer returned to the office, discovered that Miss Gold was on the telephone with Moss, and instructed her to hang up.

In other recorded conversations, Ostrer had voiced his concern that people with whom he was associated should be careful in their dealings with Moss, since he might be recording any conversations with them.

*Subsequent Actions of the D.A.'s Office.*

Detective Walter Finley, an officer who was on duty at the monitoring plant on November 21, 1972 and overheard the Ostrer-November conversation, concluded that he was listening in on preparations to commit a crime. Finley was not aware that November was an attorney, and there is little in the substance or tenor of that conversation to suggest to an eavesdropper that this was a conference between an attorney and client. Concerned that there might be an attempt afoot to commit the state crime of Coercion, Finley discussed this information with his fellow officer at the monitoring plant, and with his supervisor. They then reported it to Assistant District Attorney John Fine, who was in charge of the D.A.'s investigation. Fine was aware that November was an attorney, but nevertheless believed that the intercepted communication was evidence of preparation for a criminal act.[6]

Defendant contends that the November 21st conversation does not demonstrate a plan to coerce Moss or to obstruct justice, and that subsequent intercepted conversations indicate, to the contrary, that Ostrer did not want any contact with Moss. Furthermore, defendant contends that the November 21st conversation must be understood as an innocent effort to prevent Moss from testifying falsely against Ostrer, and, rather than an obstruction of justice, any

confrontation with Moss would have been designed to prevent Moss from testifying falsely.

Section 135.60 of the New York Penal Law provides in relevant part that:

"[a] person is guilty of coercion in the second degree when he compels or induces a person . . . to abstain from engaging in conduct in which he has a legal right to engage, by means of instilling in him a fear that, if the demand is not complied with, the actor or another will: . . . [e]xpose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule."

See also, 18 U.S.C. § 1503; *United States v. Cioffi,* 493 F.2d 1111, 1118–19 (2d Cir.), *cert. denied* 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974).

No evidence appears in this record that Ostrer, November or persons associated with either of them actually attempted to intimidate or coerce Moss, and apparently, to the extent, if any, that a criminal act may have been contemplated, the plan never passed the discussion stage.

Ostrer contends that the November 30th Gold-Moss telephone conversation suggests that there was no plan to intimidate Moss. The inference, if any, to be drawn from this conversation is not so unequivocal. The same officer, hearing both the November 21st and November 30th conversations, would not necessarily conclude from what Gold said, that the plans which Ostrer and November had discussed had been abandoned.

▮ Whether Ostrer, November or both of them actually violated federal or state law, or really planned to do so, need not be determined here. For our purposes, it is sufficient, and I find, that state law enforcement authorities believed in good faith that a criminal act to obstruct the federal prosecution appeared to be in preparation.

---

6. We observe that "[a]ttorneys, unlike Calpurnia, are not necessarily always above suspicion." *United States v. Tramunti,* 513 F.2d 1087, 1103 (2d Cir.), *cert. denied,* 423 U.S. 832, 46 L.Ed.2d 50 (1975).

Also, there was a reasonable basis in fact for their holding this belief.[7]

On December 22, 1972, State Supreme Court Justice Jacob Grumet signed an amended order authorizing the continuation of electronic surveillance by state authorities (Ex. C). The amended order stated that there was now reasonable grounds to believe that evidence of Coercion in the first degree might be obtained through continued surveillance. In support of the state's application, Detective Finley submitted an affidavit reciting, among grounds for the expanded and continued surveillance, the Ostrer-November conversation of November 21, 1972.

### Communications Between State and Federal Prosecutors.

Assistant District Attorney Fine was reasonably and properly concerned about what appeared to him to be the coercion of a prospective federal Government witness. On December 21, 1972, in the ordinary and regular course of his duties, Fine discussed the substance of the November 21, 1972 conversation with then Chief Assistant District Attorney Alfred Scotti, who also served as head of the D.A.'s Rackets Bureau. Fine told Mr. Scotti that there was an attempt to tamper with a federal Government witness by scaring him into giving testimony that would not be favorable to the Government, at the risk of having his adulterous relationship exposed.

Scotti and Fine agreed that the exertion of pressure of this nature upon a witness was improper. The state prosecutors concluded that they had a duty to alert the federal prosecutors so as to prevent an obstruction of justice. Scotti and Fine did not discuss recommending any course of action for the United States Attorney to pursue.

Although the state prosecutors determined that duty compelled their disclosure of the substance of their information and knowledge to federal authorities, they were equally concerned about maintaining the security of their investigation, and, in particular, the confidentiality of their electronic surveillance. Fine was under the wrong impression that an investigator employed by Ostrer [Lynch] had some current relationship with federal authorities. Scotti instructed Fine to advise the United States Attorney of the substance of the information without disclosing its source.

The D.A.'s people had an overriding interest in the protection of the secrecy of their surveillance. With reason, they regarded the United States Courthouse as a leaky ship. See, for example, *In re Biaggi*, 478 F.2d 489 (2d Cir. 1973), in which "authoritative sources" revealed the contents of secret grand jury proceedings in this District to a newspaper. They [he] did so with impunity. And in *United States v. Rosner*, 485 F.2d 1213, 1217 (2d Cir. 1973), *cert. denied* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974), a seasoned criminal practitioner concluded that a source in the federal prosecutor's office could, for money, supply helpful information. The Court of Appeals described what took place:

"Rosner said he wanted 3500 material. Rosner told Leuci that he understood that there were four witnesses in the case and that 'two were good and two are bad,' and that he 'would like to find out what two are good and what two aren't good.' Leuci told Rosner that although his contact had not yet established a price for the information Rosner wanted, Leuci

---

**7.** Defendant contends that, since neither federal nor state authorities later initiated prosecution of criminal charges based on this conversation, they did not entertain a good faith belief that the plans discussed were unlawful. The Assistant United States Attorney who tried this case testified that there were discussions within the United States Attorney's Office whether an indictment should be sought for violation of 18 U.S.C. § 1503 [the federal obstruction of justice statute]. They concluded that, at most it was an attempted obstruction of justice. As a result of the discussion, it was determined that such a prosecution would be a poor allocation of resources because Ostrer was already convicted on the instant charges, and the case would be difficult to prove. That a prosecutor, in the proper exercise of his discretion, ultimately decided not to prosecute does not imply that there was no reasonable basis for an investigation of suspected criminal activity.

'would appreciate it if something were done' for his 'contact' in the United States Attorney's office, 'as soon as possible.' Rosner and DeStefano stepped away from the table and Leuci saw Rosner pass DeStefano some money. When they returned to the table DeStefano passed Leuci $400 under the table."

In the *Rosner* situation, those purporting to sell secret information were acting in an undercover capacity, but the fact that defendant there fell for their little act suggests such occurrences were not unheard of.

It was reasonable for Scotti and Fine to seek to discharge their perceived duty without risking the compromise of their own continuing efforts.

At the conclusion of their discussion, Mr. Scotti attempted to arrange a meeting between Fine and the Assistant United States Attorney in charge of the federal prosecution. Scotti first telephoned the United States Attorney for the Eastern District and was informed that Ostrer was not being prosecuted in that District.[8] Scotti then called then Chief Assistant United States Attorney Silvio Mollo, of this District. Scotti told Mr. Mollo that an Assistant District Attorney had information that would be of interest to the Assistant United States Attorney on the Ostrer case. Scotti did not mention that the information involved a Government witness named Moss, nor that the source of his information was electronic surveillance.

Mr. Mollo conveyed this message to Assistant United States Attorney Harold McGuire, who was then in charge of the prosecution of Dioguardi and Ostrer, and instructed him to call Assistant District Attorney Fine because Fine had information relevant to the federal case. McGuire made an appointment to meet Fine in Fine's office the following day.

At the December 22nd meeting, Fine told McGuire, in substance, that Ostrer had certain information regarding Moss, and expressed his fear that this information would be used to effect an obstruction of justice. McGuire testified, and I find, that Fine did not venture a recommendation concerning what McGuire should do with this information, since it was apparent that Fine did not know anything about the federal case. McGuire told Fine that he did not have to worry about an obstruction of justice, because it was not McGuire's present intention to call Moss as a witness, at least, not as part of the Government's direct case.

Fine did not disclose that the information regarding Moss had been obtained from electronic surveillance or from a conversation between Ostrer and November.[9]

On February 21, 1973, after a verdict was returned in this case, the state authorities terminated surveillance and searched Ostrer's office pursuant to a warrant. On April 18, 1973, Fine and McGuire conferred again. Then, for the first time, Fine informed McGuire of the electronic surveillance, and that the information regarding attempted coercion of Moss had been obtained from an intercepted conversation between Ostrer and November.

*The Trial.*

On January 4, 1973, the trial of Dioguardi and Ostrer on this indictment began before Chief Judge Edelstein of this Court and a jury. A full exposition of the facts adduced at trial appears at 492 F.2d 70 (2d Cir. 1974) with which familiarity is assumed. We discuss the evidence below only with regard to the case proved against Ostrer.

The case against Ostrer was presented primarily through the testimony of Hellerman, the chief manipulator in the Belmont scheme. Hellerman described the scheme by which the price of Belmont was to be

---

8. The limited meaning and effect of the surveillance is shown by the fact that the D.A.'s Office did not even know where the case was pending.

9. McGuire did not know that November was the source of this information. McGuire certainly knew that November was an attorney. See *November v. Time, Inc.*, 13 N.Y.2d 175, 244 N.Y.S.2d 309, 310, 194 N.E.2d 126 (1963), a defamation case in which McGuire was an attorney for the defendant.

manipulated from $5.00 or $6.00 per share in January 1970 to approximately $50.00 per share in May of that year. Hellerman testified that he offered Ostrer the opportunity to buy a portion of the Belmont stock issue at $15.00 per share, with the understanding that Hellerman would receive one-half of the profits and would guarantee Ostrer against any loss. Ostrer committed himself to purchase 14,000 of the approximately 28,000 outstanding shares at a cost of $210,000.00. Hellerman made arrangements to have others purchase the remaining 14,000 shares.

The other individuals whose participation Hellerman secured were able to pay for their shares, but Ostrer was unable to raise the $210,00.00 that he had committed himself to raise, and the selling brokers were waiting for his payment. Hellerman arranged, through Dioguardi, for Ostrer to borrow $60,000.00 from an organized crime figure, one Hickey DiLorenzo, at 1½% interest per week. Hellerman himself advanced Ostrer over $52,000.00 to cover Ostrer's obligation on 3,500 shares of stock. Ostrer, still having difficulty raising the balance that he owed on these shares, sought other financial sources.

Hellerman testified that Ostrer had mentioned several people to whom he was attempting to sell a portion of his allocated shares. One of the persons mentioned who was considering purchasing a portion of Ostrer's commitment was Aubrey Moss.[10] Hellerman, on cross-examination by Mr. Edelbaum, Ostrer's trial counsel, testified that he understood that Ostrer had an agreement with Lee Evins to purchase a portion of Ostrer's allocation, and that Ostrer would guarantee Evins against loss, and would share in Evins' profits. Hellerman also testified that Ostrer had an agreement with Fred Flatow for the purchase of shares.

In May 1970, the manipulation scheme failed when, without notice to the manipulators, the President of Belmont sold his "investment" stock through non-participating brokers. The market was unable to absorb this influx of shares. Hellerman was unwilling to purchase the shares himself, and unable to find other purchasers at the now inflated price. The market for Belmont stock collapsed, and Ostrer and others were left with considerable losses.

Ostrer attempted to hold Hellerman responsible for his losses, and Dioguardi subsequently arbitrated their dispute.

Ostrer contends on this motion that had Moss testified as a Government witness, his testimony on cross-examination would have been helpful to the defense, and that but for the intrusion on his conversations with counsel, the Government would have blundered into calling Moss as a witness.

Moss would have testified that he purchased 2,000 shares of Belmont stock from Ostrer for $30,000.00 with the agreement that he and Ostrer would split the profits "50–50" and that Ostrer would hold Moss harmless against any loss. Prior to trial, Mr. Edelbaum had seen a copy of a written agreement memorializing this understanding between Moss and Ostrer. Mr. Edelbaum testified at the evidentiary hearing that, if Moss were a witness, Edelbaum would have laid a proper foundation for the admissibility of the written agreement. Ostrer suggests that this evidence would have cast serious doubt upon the truthfulness of Hellerman's testimony, in that it would have demonstrated that Ostrer had agreed to give half of his profit to Hellerman and the other half to Moss, leaving Ostrer with no share in the fruits of the conspiracy. It is contended that Ostrer's arrangements with Evins and Flatow were similar in all respects to the arrangements with Moss.

In fact, at trial, the Government did not call Moss or Evins as a witness; Flatow had died prior to the trial. Ostrer now claims he was faced with a dilemma whether to

---

10. Some indication of the peripheral importance of Aubrey Moss to this case is that Hellerman, the prime mover in this scheme, identified Moss as "Harry Morse" (Trial Tr. p. 815), Hellerman did not know first-hand whether Moss had purchased a portion of Ostrer's shares, or on what terms.

call Moss, Evins or both as defense witnesses.

Mr. Edelbaum testified that he had decided against calling Moss as a witness for the defense for two reasons. First, Mr. Edelbaum did not trust Moss, based upon (1) Edelbaum's impression of Moss' demeanor in a pre-trial meeting with Moss in Edelbaum's office, and (2) the fact that Edelbaum had been told that although Moss had made statements consistent with Ostrer's innocence, he had made other statements indicating that he bore a grudge against Ostrer. Furthermore, Edelbaum knew that Moss had testified about Ostrer before the federal grand jury, but did not know the substance of that testimony. Edelbaum realized that if he called Moss as his own witness, he would not have access to the grand jury testimony but that if the Government called Moss, all his prior statements and secret grand jury testimony would be available to him on cross-examination. 18 U.S.C. § 3500.

The latter reason applied with equal force to Evins who had also testified prior to trial in the grand jury.

█ No application was made to have the Court call Moss as a Court witness.[11] It also appears that no effort was made to authenticate, and thereby render admissible, the Ostrer-Moss written agreement by proffering the testimony of persons familiar with the signatures of Ostrer and/or Moss, or the testimony of a handwriting expert.[12] Finally, the record does not indicate that there was any request for the Government to stipulate to the authenticity of the written document without there being a foundation laid by live testimony.

As noted earlier, on January 26, 1973, following more than two days of deliberation, the jury found Ostrer guilty on eleven of the counts submitted to it for its deliberation, acquitting him as to six counts.

### The Fourth Amendment Claim.

It has been stipulated for purposes of this motion that the surveillance conducted by state law enforcement authorities was in violation of Ostrer's Fourth Amendment rights. Although the constitutional invalidity of this eavesdropping is not in dispute, it is worth noting why it was unlawful.

On February 4, 1975, after Ostrer's federal conviction, in *People v. Brown,* 80 Misc.2d 777, 364 N.Y.S.2d 364 (Sup.Ct., N.Y.County, Pt. 42), a New York state court held that prior wiretap and eavesdropping orders for the residences of Anthony Salerno and Joseph Moretti, issued on August 30, 1971 had been granted absent an adequate showing of probable cause. The conversations intercepted during this Salerno-Moretti surveillance had served as the basis upon which a number of further eavesdropping warrants, including the warrant for Ostrer's office, were granted. Thus Ostrer's wiretap and all it disclosed was "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

As we have found, Fine did transmit information to McGuire that he derived from the eavesdropping on Ostrer's conversations later found to be unlawful. Cooperation between state and federal law enforcement officials is contemplated by both federal and state statutes, 18 U.S.C. § 2517 and N.Y.Criminal Procedure Law § 700.65, and acting upon the justified supposition that the surveillance was conducted lawfully pursuant to warrants, the communications between the two prosecutors were proper. See *United States v. Manfredi,* 488 F.2d 588 (2d Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974); *United States v. Forlano,* 358 F.Supp. 56 (S.D.N.Y.

---

11. Although rarely invoked, the Court, in its discretion, may call a person as a court witness. See Rule 614, F.R.Evid., which is declaratory of pre-existing law. Although Rule 607, F.R.Evid., now relieves the proponent of a witness' testimony from "vouching for" its credibility, the rule in this District was otherwise when this case was tried.

12. The document might have been authenticated by either course. McCormick on Evidence § 221 (1972); see also Rule 901, F.R.Evid., and Advisory Committee Notes. The relevance of the document should have been apparent on its face.

1973). Under these circumstances, where one prosecuting authority had reason to believe that there was an attempt to tamper with a witness in a prosecution in another jurisdiction, such communications are essential and should not be discouraged. The scope and extent of the communication were severely limited to that sufficient to satisfy the necessities.

■ The issue upon this motion is to what extent, if any, did the unlawful state surveillance taint the federal prosecution. Defendant must bear "the initial burden of producing specific evidence demonstrating taint in a substantial portion of the Government's case against him," although the Government "has the ultimate burden of persuasion to show that its evidence . . . was not tainted through a connection to the illegally procured wiretap information." *United States v. Sapere*, 531 F.2d 63, 66 (2d Cir. 1976). See also *Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). For reasons to be elaborated further below, the Court finds that the defendant has failed to satisfy the initial burden, and, even if it were to be assumed, solely for the argument, that he has made the requisite showing, the Government has amply demonstrated that the trial was conducted and that the evidence upon which Ostrer was convicted was derived "by sufficiently different or distinguishable means to be pure or 'purged' " of the primary taint. *United States v. Sapere*, supra, at 64, n. 1. See also *Wong Sun v. United States*, supra, 371 U.S. at 487–88, 83 S.Ct. 407.

*The Sixth Amendment Claim.*

Defendant claims that by means of this unlawful surveillance, the Government intruded upon his attorney-client relationship with November, and thereby violated his Sixth Amendment right to the effective assistance of counsel in the federal trial. Defendant urges this Court to apply a *per se* rule against which this conviction could not stand. See *Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966); *O'Brien v. United States*, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967).

However, the application of such a *per se* rule has been reserved for those instances where the conduct of the Government has been "manifestly and avowedly corrupt." "The *per se* rule represents a moral as well as a legal condemnation of such egregious and unequivocal conduct for which sanctions are imposed against the Government as punishment regardless of the defendant's guilt." *United States v. Gartner*, 518 F.2d 633, 637 (2d Cir. 1975).

■ The circumstances surrounding this intrusion do not suggest that the federal Government or the D.A. has acted culpably. What occurred here was not a purposeful intrusion designed to infiltrate the defense camp and spy on its strategies. To the contrary, this was an incidental intrusion by state authorities completely unfamiliar with this federal prosecution.

The actual intrusion was committed by state authorities, acting pursuant to a warrant signed by a state judge, and believing that an adequate showing of probable cause had been made. In fact, there may have been an adequate showing of probable cause, however, the predicate for that showing was derived from prior unlawful surveillance of others.

The initial eavesdropping on Ostrer was by a detective who did not know that one participant was an attorney, or that the attorney was acting for Ostrer in this matter. Although Assistant District Attorney Fine knew that November was an attorney, he believed that November was engaged in a criminal act.

■ Under familiar principles of law, the counselling of the commission of a crime or fraud is not encompassed by the attorney-client privilege.[13] Fine disclosed to Assist-

13. "Since the policy of the privilege is that of promoting the administration of justice, it would be a perversion of the privilege to extend it to the client who seeks advice to aid him in carrying out an illegal or fraudulent scheme. Advice given for those purposes would not be a professional service but participation in a conspiracy. Accordingly, it is

ant United States Attorney McGuire only the minimum information necessary to avert the perceived obstruction of justice.[14]

The state authorities proposed the meeting without suggesting that their investigation was electronically derived, or involved an attorney. At the time they neither knew nor had reason to know that the Ostrer eavesdropping warrant was invalid.

The state authorities were motivated solely by a highminded sense of ethical obligation to insure proper and unobstructed administration of federal criminal justice. McGuire did not know that this information was derived either from electronic surveillance or from a privileged communication between attorney and client. See generally *United States v. Brown*, 484 F.2d 418 (5th Cir. 1973), *cert. denied*, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974).

 The *per se* rule is regarded as a rule of deterrence against Government lawlessness. As the Supreme Court had noted in a different context,

> "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. . . . Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974).

At each step in this limited transmission of information, the official action, state and federal, was pursued in complete good faith. There is no single act of misconduct or negligence, repetition of which must be

deterred; rather, a rule of deterrence would only serve to chill necessary communications between state and federal law enforcement authorities. Under the circumstances of this case, application of the *per se* rule would be undesirable and inappropriate.

In the absence of any evidence that the Government engaged in misconduct warranting the imposition of the sanctions inherent in the *per se* rule, the Court must consider and determine whether the defendant was in fact prejudiced by this intrusion.

*The Claims of Prejudice.*

 The prejudice claimed here is not what occurred at trial, but rather what did not occur; not in the evidence that was presented, but in the fact that Moss was not called as a Government witness.

Ostrer contends that but for the intrusion on his conversation with November, the Government to its tactical detriment, would have called Moss as a witness on its direct case. This contention in contradicted by the credible testimony of McGuire and Fine that, even prior to their meeting, McGuire had decided that it would not be necessary or desirable to call Moss as a witness. On the basis of Moss' prior testimony and McGuire's own interview, McGuire determined that Moss was not being truthful and would be a dangerous witness.

All that the Government could hope to achieve through the testimony of Moss was established by the credible testimony of Hellerman.

Ostrer contends that following Hellerman's cross-examination, the Government's case was in jeopardy, and that, if McGuire had not been counselled otherwise by Fine,

---

well settled under modern authority that the privilege does not extend to communications between attorney and client where the client's purpose is the furtherance of a future intended crime or fraud." McCormick on Evidence § 95, at 199 (1972).

**14.** Ostrer contends that there was significant intrusion upon his strategy sessions with November. I decline to so find. To the extent that strategy was overheard, there is no evidence that there was a massive transmission of

defense strategy to the federal prosecutor. Although in at least one intercepted conversation there was a discussion of whether Ostrer would testify, and the conclusion expressed that in a jury trial he could not, this was apparently not discussed by Fine and McGuire, since McGuire was still seeking information from state public records for the cross-examination of Ostrer on his prior convictions. All that Fine told McGuire out of all of this was to watch out because they were trying to coerce "Morse."

McGuire would have reconsidered his trial strategy, and called Moss to bolster the Government's case. McGuire testified, and I believe, that nothing occurred to change his trial plans, and the jury's verdict bears out McGuire's assessment. We, therefore, find that McGuire did not rely upon Fine's information in deciding not to call Moss as a witness, or in adhering to his prior decision not to do so.

Assuming solely for the argument, that McGuire reached his decision not to call Moss based upon Fine's information, any prejudice to Ostrer was not such as to warrant a new trial. As noted previously, the defense could have called Moss as a witness, or requested the Court to do so. Mr. Edelbaum testified perceptively to the dangers to Ostrer of calling Moss as a defense witness. Assessing these dangers, as against any likely benefit to result from Moss' testimony, Mr. Edelbaum exercised the wise professional judgment attained by more than forty-five years of active and successful criminal defense experience.

This renowned advocate concluded that calling Moss as a defense witness was too perilous. Instead, Mr. Edelbaum cross-examined Hellerman about the agreement with Flatow and Evins, and impliedly, Moss. His strategy was well thought out and, in all respects, professionally executed. In another exercise of defense strategy, Ostrer elected not to testify in his own defense. Mr. Edelbaum's judgment is not to be maligned simply because his client was convicted.

To summarize in this regard, defendant has failed to demonstrate that the unlawful surveillance or the intrusion upon his privileged communications tainted this prosecution. Primarily, this is so because only the most limited product of the surveillance, i. e., that they were planning to tamper with Moss, passed from the D.A.'s people to the federal prosecutor.

Before December 22nd, McGuire had determined independently not to call Moss as a witness. To the extent, if at all, that Fine's information confirmed McGuire's preconceived decision not to call Moss, or to the extent, if at all, that McGuire resisted the temptation to call Moss as a witness after the cross-examination of Hellerman, I find that the defendant was not prejudiced. If we are to assume that Moss was to provide affirmative evidence for the defense, the defendant could have called Moss.

Merely because the defendant was faced with a difficult strategic choice, the implications of which were well known to defense counsel, does not mean that the Government's conduct deprived Ostrer of a fair trial.

The Government evidence actually adduced at trial was not derived from the unlawful surveillance, nor from the intrusion upon any attorney-client conversation. The proof against Ostrer was substantial, if the jury found the testimony of Hellerman credible, as indeed it must have done in order to have returned these guilty verdicts.

*Effect of the Testimony of Moss.*

Defendant has styled this motion as a motion for a new trial based upon newly discovered evidence. The newly discovered evidence is the fact of unlawful state surveillance, followed by a state-federal conversation. Were we to consider Moss' testimony itself as the "new evidence" basis for this motion, rather than the circumstances surrounding the surveillance, we find no merit to this motion.

"To succeed on such a motion a defendant must show, inter alia, (1) that the evidence was discovered after trial, (2) that it could not, with the exercise of due diligence, have been discovered sooner, (3) that it is so material that it would probably produce a different verdict." *United States v. Slutsky*, 514 F.2d 1222, 1225 (2d Cir. 1975).

Moss' testimony fails to satisfy these criteria. The defense knew of the agreements between Ostrer and Hellerman and between Ostrer and Evins, Flatow and Moss prior to trial. Moss and the written agreement were available to the defense.

It can hardly be said that Moss' testimony would have produced a different verdict. As previously noted, Moss' testimony regarding the agreement, rather than refuting Hellerman's testimony, was consistent therewith, and also consistent with the Government's theory of the case.

*Bail Pending Further Proceedings.*

Initially, the Court believed that defendant was and continues to be enlarged on bail pending determination by the District Court of this motion for a new trial, pursuant to an order of the Court of Appeals dated December 17, 1974. The aforementioned Court of Appeals order continues bail for "24 hours after a decision by the United States District Court on the motion for new trial, or until the next panel of this Court is available to hear any subsequent bail application, whichever is the later of those two dates."

This portion of the December 17th order is somewhat puzzling. Mr. Dershowitz, defendant's counsel on this hearing stated (Tr. p. 514), "I take it is still open under the Court of Appeals ruling, whether to grant or deny bail in the event that the motion is turned down. . . ."

Apparently, the Government disagrees, and presumably bases its disagreement upon reasoning based upon the rule found in footnote 11 of *United States v. Ellenbogen,* 390 F.2d 537, 541 (2d Cir.), *cert. denied* 393 U.S. 918, 89 S.Ct. 241, 21 L.Ed.2d 206 (1968). See *United States v. Rosa,* 372 F.Supp. 1341 (S.D.N.Y.1974) for detailed discussion of the *Ellenbogen* rule, which this Court believes would be abrogated by our Court of Appeals upon a re-examination. Alternatively, the Government may regard the order of December 17th as "law of the case," and reads into it an implied negative, to the effect that the trial court could not continue the bail beyond the 24 hour period, or the availability of the next panel, whichever is later.

▋ I conclude that the District Court has jurisdiction to enlarge Ostrer's bail pending appeal from this order, and also has jurisdiction to deny bail, subject only to the fact that such denial would be stayed for the 24 hour period.

Addressing the merits of Ostrer's desire for bail, it seems appropriate that he should continue to be enlarged pending appellate finality.

▋ First, in connection with this non-violent crime, Ostrer has at all times honored the terms and conditions of his bail, and has made himself available whenever required, during a period of almost five years since this indictment was filed. His attendance at court before me at required conferences prior to the hearings, and also during the hearings, was prompt, regular and orderly.

While the facts adduced in evidence do not rise to a level which would justify granting any substantive relief on this motion, nevertheless Ostrer's claims are colorable, and the issues tendered arise in a sensitive area affecting the fundamental constitutional rights of persons charged with crimes. He is entitled to litigate these issues on the merits prior to his incarceration.

If the foregoing factors alone are deemed insufficient to warrant enlarging defendant on bail pending appellate finality, we add a general observation applicable to all convicted criminals except those whose liberty directly threatens the public peace, or who show propensity for flight. Ostrer is a mature person, whose sentence has the primary purposes of general deterrence, and specific deterrence. To the extent that our federal prison system can do anything for a convict, and we think it can, the benefits of incarceration depend upon the prisoner adjusting himself to the highly structured society of the institution, and participating fully and willingly in the educational programs and the prison industries. Before the average man will do this, all hope must be removed, except the hope of earning good time or early parole.

A prisoner who has his mind on his pending writs devotes all of his energy and thought to pending collateral attacks upon his conviction, and gains no benefit from any of the programs in the prison. Such a

man is a disruptive factor for those who do not have pending writs, and has no incentive to throw himself into the many voluntary programs and make the best use of his time. Generally, we would be well advised to restructure our judicial system so as to gain early finality of judgments, and whenever possible defer imprisonment until such finality has been reached.

For all of the foregoing reasons, and because we cannot say that this motion was in any sense frivolous, or dilatory, defendant is continued on his existing bail pending appellate finality, unless the Court of Appeals shall direct otherwise, or shall interpret its December 17, 1974 order so as to represent a clear withdrawal from this District Court of the power to enlarge defendant upon such bail. We do not so read that order.

So Ordered.