577 F.2d 782
 Louis OSTRER, Petitioner-Appellant,
v.
UNITED STATES of America, Appellee.
 No. 525, Docket 77-2103.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 16, 1978.
Decided April 18, 1978.
 
 Alan Dershowitz, Cambridge, Mass. (Harvey A. Silverglate, Ann Lambert Greenblatt, Atty., Boston, Mass., Kenneth Kurnos, Silverglate, Shapiro & Gertner, Boston, Mass., of counsel), for petitioner-appellant.
 Richard Weinberg, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Lawrence Pedowitz, Robert J. Jossen, Asst. U. S. Attys., New York City, of counsel), for appellee.
 Before MOORE, SMITH and MANSFIELD, Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 On January 26, 1973, Louis Ostrer was convicted by a jury in the Southern District of New York, David N. Edelstein, Chief Judge, after a three-week trial on 11 counts of a 40-count indictment charging him with conspiring in violation of 18 U.S.C. § 371 to violate certain provisions of the federal securities laws and regulations, 15 U.S.C. §§ 77q(a), 77x, 78j(b), 78ff, Rule 10b-5, 17 C.F.R. 240.-10b-5, and the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, and with substantive violations of these securities and mail fraud statutes. Chief Judge Edelstein sentenced him to a term of three years imprisonment and to pay fines of $55,000. We affirmed his conviction in United States v. Dioguardi, 492 F.2d 70 (2d Cir.), cert. denied, 419 U.S. 829, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974).
 
 
 2
 After pursuing other post-conviction relief without success[1] Ostrer, who has now been free on bail for more than five years, was scheduled to commence service of his sentence on April 15, 1977. However, on April 14, 1977, he filed in the district court a petition to vacate his conviction pursuant to 28 U.S.C. § 2255 on the ground that the Government had not disclosed at Ostrer's trial certain information required by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and 18 U.S.C. § 3500, and that additional evidence had been acquired concerning the mental instability of a person who had served on his trial jury. After an evidentiary hearing, the petition was denied. We affirm.
 
 
 3
 The evidence at Ostrer's trial showed that he and several others, including his co-defendant John Dioguardi, were involved in a scheme to raise artificially the price of the stock of the Belmont Franchising Corporation (Belmont). The cornerstone of the Government's case against Ostrer was the testimony of Michael Hellerman, a participant with Ostrer and Dioguardi in the Belmont fraud. Ostrer's defense at trial consisted primarily of an attempt to impeach Hellerman's credibility. See United States v. Dioguardi, supra, 492 F.2d at 73-74 (2d Cir. 1974).
 
 
 4
 The present appeal is concerned principally with evidence of two incidents known to the Government prior to Ostrer's trial, but which were not discovered by Ostrer until recently. He contends that this evidence should have been made available to him as Brady material before trial because it amounted to benefits given to Hellerman by the Government in return for his cooperation and testimony, which Ostrer's counsel could have exploited in his cross-examination of Hellerman to show a further motive for Hellerman to lie.
 
 
 5
 The first of these incidents is the so-called "Natco Episode." While Hellerman was cooperating secretly as a Government informant in 1970-71 he advised the United States Attorney's Office that he and several other individuals were involved in a fraud designed to drive Natco, Inc. ("Natco"), and Merchandise Plus, Inc., two Long Island-based companies, into bankruptcy. As the companies went bankrupt, Hellerman and others, including Steven Schustek, the president of Natco, planned to steal the companies' assets and leave the creditors empty-handed.
 
 
 6
 Hellerman informed the Government that part of this fraud involved the cashing of an $80,000 check through a casino in the Bahamas. Acting on Hellerman's information, FBI agents were able to thwart this aspect of the fraud by preventing the check from being cashed. As a result, however, the Government found itself in possession of corporate funds belonging to Natco.
 
 
 7
 Robert Morvillo, formerly chief of the Criminal Division of the U.S. Attorney's Office for the Southern District of New York, testified at the hearing on appellant's § 2255 petition that the Government did not feel that it could maintain control over this money for fear of accelerating Natco's decline into bankruptcy and of possibly becoming entangled in litigation with Natco or its creditors. The situation was complicated by Hellerman, who was deeply in debt to several loansharks and had suggested to Morvillo that the Government give him the money to pay his debts.
 
 
 8
 Morvillo rejected this suggestion but told Hellerman that the Government would release the money to a lawyer representing Natco on the assurance that the funds would be placed in the corporation's account. Both Morvillo and Hellerman testified that Morvillo warned Hellerman and Schustek that they would be prosecuted if the money was later diverted by them to non-corporate purposes.
 
 
 9
 On February 1, 1971, Edward Kurland, a lawyer retained by Schustek for the sole purpose of retrieving the $80,000, presented to the U.S. Attorney's Office a written demand on behalf of Natco for the funds, which were then released to him and deposited in a corporate account, according to Morvillo's instructions. Within a few weeks, however, the money was transferred to another account, and Schustek then withdrew all but a few dollars of the full amount, at least a portion of which was used by Hellerman to pay his debts.
 
 
 10
 Morvillo could not recall whether he learned prior to Ostrer's trial that Hellerman had been able to pay his debts from the $80,000; and Hellerman did not recall ever so informing Morvillo. The record contains an uncontradicted affidavit, which the district court credited, from the Assistant U.S. Attorney who prosecuted Ostrer in 1973 to the effect that prior to Ostrer's trial he knew nothing of Natco or of the $80,000 transaction. However, the record also contains a memorandum dated April 26, 1971 (less than three months after Morvillo gave the Natco check to Kurland) sent to Morvillo from the Assistant U.S. Attorney directly responsible for Hellerman-related investigations in 1971, which describes Schustek's transfer of the money from the corporate account and his withdrawal of "all but $23 of the $80,000 in cash $100 bills." On the basis of this memorandum the district court found that the Government knew, or should have known, as early as April, 1971, that Schustek and Hellerman had not heeded Morvillo's instructions concerning the proper disposition of the Natco funds.
 
 
 11
 Although Judge Brieant found that Ostrer had failed to establish that the $80,000 was "intentionally released to Hellerman so he could pay loansharks," he also concluded that the Government's decision had in effect made it possible for Hellerman to gain a benefit and that it should have advised counsel of these facts prior to trial.
 
 
 12
 The second undisclosed incident was the Government's decision not to oppose Hellerman's motion for enlargement of his bail limits. During the summer of 1972, nearly two years after Hellerman had begun cooperating with the Government, he had been named as a defendant in several different indictments and was expected to testify at Ostrer's trial. This testimony would destroy Hellerman's effectiveness as a confidential informant, and it was anticipated that he would have to be relocated and given a new identity when the trial was completed.
 
 
 13
 In August, 1972, several months prior to Ostrer's trial, Hellerman's counsel filed a motion to enlarge Hellerman's bail limits so that he could travel to Europe for a few weeks. The purpose of the trip was partly recreational, and partly to give Hellerman and his family an opportunity to consider possible relocation sites. After obtaining assurances from defense counsel (now Judge) Vincent Broderick and Thomas Edwards to the effect that Hellerman would neither flee nor secrete money in European banks while on this trip, the Government decided to take no position with respect to this motion. The motion was granted by Judge Lasker. Hellerman travelled to Europe and returned.
 
 
 14
 The district court held that the Government's nonopposition to the Hellerman bail motion "was certainly a reward for his co-operation." Judge Brieant concluded that the facts concerning the motion should have been disclosed to defense counsel.
 
 
 15
 Although Judge Brieant concluded that the information regarding the two incidents should have been turned over to the defense, he denied Ostrer's petition on the ground that the evidence was not material, in view of the extensive impeachment data with respect to Hellerman that had been fully exploited on cross-examination. The additional evidence, Judge Brieant concluded, did not "raise a reasonable doubt." Similarly, the district court rejected Ostrer's contention that the Government's failure to make available evidence with respect to various other matters (described below) violated Brady. From this decision Ostrer appeals.
 
 DISCUSSION
 
 16
 In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that the Government's failure to make available exculpatory evidence specifically requested by the defendant (in that case, a co-defendant's statement corroborating the accused's version of a homicide) constituted a denial of due process. The principle has since been extended to apply to material evidence that would impeach a Government witness whose "reliability . . . may well be determinative of guilt or innocence." Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1977) (knowing use by Government of perjured testimony regarding promises by the prosecutor to the witness), quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).
 
 
 17
 These decisions left open the question of what standards were to be applied in determining whether evidence would be deemed "material" for Brady purposes. In most cases the issue can be resolved without difficulty. Certain proof is so clearly exculpatory or valuable for impeachment purposes that any reasonable prosecutor will immediately recognize its utility to the defense. But the possible value of other proof, even with the aid of hindsight (which is not available when the prosecutor must decide whether to disclose) may be speculative, extremely doubtful, or not apparent. Since materiality is a rather broad concept, apt to be elusive at times, it might be interpreted by some as requiring the Government to turn over to the accused virtually everything in its files that could by any stretch of the imagination be useful to the defense, whether or not foreseeable.
 
 
 18
 It was therefore essential to establish some standards or guidelines for compliance with Brady's requirements. This the Supreme Court undertook to do in United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). There the Court described the types of cases in which the Brady rule applies: (1) where the undisclosed evidence shows that the Government's case includes perjured testimony and that the prosecutor knew, or should have known, of the perjury, (2) where the defendant made a specific request for particular undisclosed information, and (3) where the defendant made no request, or made only a general request. The Court held that when the Government's nondisclosure falls within either of the first two categories a strict standard of materiality should apply, with the defendant being entitled to a new trial if there is any reasonable likelihood that the evidence could have affected the outcome of the trial. Agurs, supra, 427 U.S. at 103-04, 96 S.Ct. 2392. On the other hand, if the defendant makes no request or only a general request for evidence that is then not disclosed (e. g., "all Brady material," "all exculpatory material"), he is entitled to a new trial only if the undisclosed evidence, viewed in the context of the entire record, creates a reasonable doubt that otherwise would not exist. Id. at 112-13, 96 S.Ct. 2392.
 
 
 19
 Ostrer has argued, both below and here, that this case falls within either the first or second of these categories described in Agurs. Clearly it does not meet the requirements of the first, since Judge Brieant could "not find on the evidence submitted here that Hellerman committed any specific perjury at trial. It follows that the Government did not knowingly rely on perjured testimony at Ostrer's trial." Nothing in the record on appeal leads us to disturb this finding.
 
 
 20
 Nor does this case come within the second Agurs category, since there was no specific request for the particular undisclosed information. Indeed, Ostrer himself made no request at all. His co-defendant Dioguardi, however, did make a pretrial non-specific Brady request, and Ostrer now contends that he should be deemed to have joined in his co-defendant's request.[2] Even if Ostrer is deemed to have joined in the Dioguardi request, the latter was not sufficiently specific to come within the second Agurs category. Approximately one month prior to the trial, Dioguardi's counsel asked for
 
 
 21
 "4) any other material in the possession of the Government bearing adversely on the credibility, character and reputation of Michael Hellerman; and 5) any other material relating to any matter which defense counsel could properly use in cross-examination to inquire into Hellerman's motive and bias in favor of the Government or expectation of favor from the Government."
 
 
 22
 This request amounted to nothing more than a boilerplate demand for "all Brady material" or for "anything exculpatory," which the Supreme Court described in Agurs as a request that gives "the prosecutor no better notice than if no request is made." 427 U.S. at 106-07, 96 S.Ct. at 2399. A specific request, said the court in Agurs, is one similar to the request made in Brady itself a request for "specific information" that gives the prosecutor "notice of exactly what the defense desire(s)."[3] 427 U.S. at 106, 96 S.Ct. at 2398. See United States v. Lasky, 548 F.2d 835, 839 (9th Cir. 1977).
 
 
 23
 Since only a general request was made in this case, appellant's burden under Agurs is to show that the undisclosed evidence, when "evaluated in the context of the entire record," 427 U.S. at 112, 96 S.Ct. at 2402, creates a reasonable doubt about his guilt. This he has failed to do.
 
 
 24
 Ostrer's defense at trial consisted primarily of an attack on Hellerman's credibility; thus the only conceivable way in which the undisclosed evidence could create a reasonable doubt about Ostrer's guilt would be if the knowledge of those two impeaching incidents, in addition to the numerous others used on cross-examination, would persuade a fact-finder to disbelieve Hellerman's testimony against Ostrer. We are satisfied that the additional evidence would not have had such an effect.
 
 
 25
 The undisclosed evidence fell far short of a Government benefit in exchange for the witness' cooperation. It remains undisputed that Morvillo refused to turn over the $80,000 to Hellerman and that, upon deciding to turn it over to Natco, had warned him and Schustek that they would be prosecuted if they diverted the money to noncorporate purposes. At most the Government's role, in view of Schustek's disregard of this warning, became ambiguous. The suggestion that the Government's non-opposition to the court-approved enlargement of bail would have been useful impeachment evidence borders on the frivolous. However, even accepting Ostrer's contention that these two incidents could have been used effectively to attack Hellerman's credibility as a witness, they represented a mere drop in the bucket when viewed in the context of the wealth of other impeaching material used upon cross-examination of Hellerman.
 
 
 26
 "During the trial the jury heard Hellerman repeatedly acknowledge his participation in numerous criminal activities. Hellerman testified that during the preceeding (sic) five years he was involved in approximately eight to twelve criminal acts for which he was not prosecuted, and three cases in which he pleaded guilty. (Belmont tr. 390-91, 602). Hellerman acknowledged his role in frauds involving the securities of Belmont Franchising Corporation, Globus, Automated Information, Minute Approval Credit, and At Your Service Leasing. (Belmont tr. 690-91; 716-17). He admitted that he was involved in having someone pay bribes to New York City policemen, and he testified to his well founded belief that the United States Attorney's Office would convince the local authorities not to prosecute him. (Belmont tr. 806-07). Hellerman acknowledged that he purchased stocks, dresses, and jewelry which he knew to have been stolen (Belmont tr. 808), and that he paid money to others for the purpose of bribing state court judges, a state liquor authority investigator, and a union delegate. (Belmont tr. 811). In addition, Hellerman testified that he had been involved in criminal activity in connection with Natco and Merchandise Plus (Belmont tr. 741), that he had been barred by the SEC from activities in the securities industry since 1961 (Belmont tr. 606), that he told Jack Kelsey to file false papers with the SEC hiding Hellerman's interest in a brokerage firm (Belmont tr. 612), and that he participated in a scheme to submit a fraudulent check to a Bahamian bank. (Belmont tr. 619). He also acknowledged disobeying court orders. (Belmont tr. at 731).
 
 
 27
 "The jury also heard Hellerman testify that after he had begun to cooperate with the Government and had agreed not to engage in any additional criminal activity, he broke that promise, and continued his illegal conduct. (Belmont tr. 822-23; 938-39; 948). Hellerman testified that after he broke his promise he engaged in swindles which earned him over $250,000.00 and for which he was not prosecuted.
 
 
 28
 "Finally, the summations for both Ostrer and Dioguardi were replete with references to Hellerman's corrupt and criminal activity and the 'extraordinary' agreement he entered into with the Government immunizing him from prosecution for most of his crimes.
 
 
 29
 "Trial counsel emphasized clearly to the jury that the Government had 'bought' the testimony of a man who, having promised the United States Attorney's Office once before that he would not commit any more crimes, then went out and continued his corrupt and sordid activities. (Belmont tr. 1721-24; 1731-32; 1754; 1783; 1793-94)." Findings and Conclusions of Judge Brieant, 8/12/77, pp. 39-40.
 
 
 30
 In light of this evidence, as well as the direct incriminating evidence against Ostrer (the sufficiency of which was not even challenged on direct appeal, 492 F.2d 70), we agree with the district court that the Natco episode and the Hellerman bail motion were not material.[4] Disclosure of this information would not have created a reasonable doubt in the minds of the jurors who found Ostrer guilty; nor does the disclosure now raise a reasonable doubt about Ostrer's guilt.[5] Consequently a new trial is not warranted. Accord, United States v. Stassi, 544 F.2d 579, 584 (2d Cir. 1976); United States v. Erb, 543 F.2d 438, 443 (2d Cir.), cert. denied, 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976); Brach v. United States, 542 F.2d 4 (2d Cir. 1976); United States v. Corr, 434 F.Supp. 408, 414 (S.D.N.Y.1977).
 
 
 31
 Ostrer also contends that the Government violated its Brady obligation by not disclosing evidence concerning (1) a motion by Hellerman to reduce his sentence, (2) the selection of the location where Hellerman served his sentence, (3) a reduction in Hellerman's legal fees, and (4) the non-prosecution of Hellerman's family. The district court rejected these contentions, and after a careful review of the record, we affirm this aspect of the decision below, as well as the district court's finding that the Government complied with its obligations under 18 U.S.C. § 3500. None of these claims merits discussion.
 
 
 32
 We also affirm the district court's decision to deny the claim for a new trial based on purportedly new information concerning the mental state of a trial juror. On similar facts, the denial without hearing of a virtually identical motion was affirmed by this court in United States v. Dioguardi,492 F.2d 70, 78-81 (2d Cir. 1974). We fully agree with the district court's characterization of this aspect of Ostrer's petition as "cumulative, repetitious, and untimely." The new information concerning the juror's mental state proffered by Ostrer in the affidavit of Junius Rush was substantially undermined by the affidavit later obtained from Mr. Rush and filed by the Government in which the affiant modified, if not repudiated, much of his first sworn statement.
 
 
 33
 The order of the district court is affirmed with the direction that the mandate issue forthwith.
 
 MOORE, Circuit Judge (concurring):
 
 34
 I concur in affirming the order denying appellant's petition to vacate his conviction but differ in my reasons in one, to me, important respect. I do not agree that the Government's role with respect to the $80,000 was "ambiguous" or that this incident and the enlargement of bail incident represented "a mere drop in the bucket". However, whether they would have caused the bucket to overflow is quite another matter.
 
 
 35
 I believe that Judge Brieant's finding, as follows, is clearly supported by the record:
 
 
 36
 "(1) the Government prevented Sammy Feet (Hellerman's co-conspirator in the Natco fraud) from stealing the $80,000 in Natco funds by freezing the proceeds of the check which Schustek and Feet had caused to be deposited in the Bahamas casino . . .; (2) Hellerman and Schustek did reveal the full story of the Natco swindle, including their own participation, to the Government, thereby making the Government fully aware of the intended goal of Natco's bankruptcy, before it released the $80,000 to Kurland (the lawyer who presented a handwritten retainer signed by Schustek to the Government in order to obtain the funds "on behalf of Natco"); (3) the Government was aware before it reached its decision to release the funds to an attorney authorized by Schustek, that Hellerman desperately needed this money to pay off loansharks who were threatening his life. . . .
 
 
 37
 "In the face of all of this, the Government released the funds (the $80,000) to . . . Kurland . . . without investigating either Kurland or his intentions, or those of Schustek with respect to the $80,000.00. In addition, the Government made no effort to ascertain whether Natco was actually then bankrupt (which it was as of January 26, 1971 . . .) or whether the intended fraud was sufficiently advanced so that the seized money could be held in the Government's possession as evidence, or to prevent its theft by Hellerman.
 
 
 38
 "Hellerman expressed his own belief, at the evidentiary hearing and in (Wall Street Swindler ), that the Government intentionally allowed him to retrieve the $80,000.00 thus conferring a substantial benefit on him. . . .
 
 
 39
 ". . . The Court finds, as it must based on the record before it, that it should have been readily apparent to the Government, when it did release these funds, that the money inevitably would end up in Hellerman's pocket. In effect, the Government chose to look the other way. While denying Hellerman's direct request for the money, the Government accorded him the opportunity to gain possession of it indirectly by the charade of having the corporation's 'attorney' demand and receive it for deposit in a corporate bank account. By conscious avoidance the Government thus intentionally eased the way for Hellerman to benefit from its decision to release the $80,000.00 in stolen funds. . . ." (District Court's Findings, Appendix at 318-19) (footnote omitted).
 
 
 40
 I also believe that the Brady request was "specific",[1] that these disclosures were embraced within the Brady doctrine, were material, and should have been disclosed. Had there been no other evidence reflecting on Hellerman's credibility, these governmental favors would, in my opinion, have been admissible and material to that important issue.
 
 
 41
 However, Hellerman's credibility had been subjected to a devastating barrage, set forth in detail by Judge Brieant and incorporated in Judge Mansfield's opinion. Since we are faced, in reality, with the speculation of what the jury or even one juror would have done had this information been presented, we cannot, under the law, speculate, but must substitute well-reasoned judgment therefor. Searching retroactively into the composite mind of the jury, I, too, come to the conclusion that the addition of these withheld facts would not have created a reasonable doubt, in view of all the evidence before them, of Ostrer's guilt hence, I would affirm.
 
 
 
 [1]
 Shortly after his conviction, Ostrer moved for a new trial on the basis of a juror's alleged mental incompetence. Judge Edelstein denied this motion at the time of sentencing. We affirmed the denial of the motion in United States v. Dioguardi, 492 F.2d 70 (2d Cir.), cert. denied, 419 U.S. 829, 95 S.Ct. 49, 42 L.Ed.2d 53 (1974)
 On December 11, 1974, Ostrer filed another motion for a new trial, which alleged that during his trial the Government had been privy to conversations between Ostrer and his counsel. After a hearing this motion was denied, United States v. Ostrer, 422 F.Supp. 93 (S.D.N.Y.1976), and the denial of the motion was affirmed in United States v. Ostrer, 551 F.2d 303 (2d Cir.), cert. denied, 430 U.S. 946, 97 S.Ct. 1581, 51 L.Ed.2d 793 (1977).
 
 
 [2]
 The district court's opinion states that "Ostrer's trial counsel specifically requested that the Government make available any material bearing adversely on the credibility, character or reputation of Hellerman." Prior to oral argument we were unable to discover in the record any support for this finding. Nor was Ostrer's counsel at oral argument able to point to Ostrer's request for Brady material in the record. Following argument, we received a letter from Ostrer's counsel directing our attention to certain documents in the record. After reviewing these materials, we are still convinced that Ostrer never made a Brady request, and that the district court's finding refers to the Dioguardi request
 
 
 [3]
 In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), defense counsel made the specific request prior to trial to examine the out-of-court statements made by Brady's co-defendant
 
 
 [4]
 Technically, the district court erred in holding that it was a violation of Brady not to disclose the Government's role in the Natco episode and the enlargement of Hellerman's bail limits but that since this evidence was not material relief should be denied. Brady requires only the disclosure of material information, not all evidence that might conceivably be of use to the defense. Since the undisclosed evidence here was not material there was no failure to comply with Brady
 
 
 [5]
 The Agurs opinion suggests that the district court's task in a case such as this is to determine for itself whether the undisclosed evidence creates a reasonable doubt concerning the defendant's guilt, rather than whether the evidence would have created a reasonable doubt in the minds of the trial jurors. See 427 U.S. 112-14, 96 S.Ct. 2392, see also 427 U.S. 115-16, 96 S.Ct. 2392 (Marshall, J., dissenting). Under either approach, we are satisfied that the denial of the petition should be affirmed
 
 
 [1]
 That the request was made by Ostrer's co-defendant and not Ostrer himself, is, in my view, immaterial, given the function of the request i. e., to ease the prosecutor's task of determining the "materiality" of exculpatory evidence in the context of the case, Agurs, 427 U.S. at 106-07, 96 S.Ct. 2392 and given the fact that copies of the motion papers were sent to Ostrer's counsel as well as to the court and the prosecutor. The motion, moreover, had requested a pretrial conference for the purpose of obtaining a Brady order. Ostrer's counsel and the court might well have believed that the co-defendant's request in this multi-defendant proceeding would be sufficient to protect the Brady rights which were shared by Ostrer and co-defendant Dioguardi, both of whose convictions would be dependent, in large part, on the jury's assessment of Hellerman's credibility
 Sound policy would seem to require that no hypertechnical lines be drawn in this area. To require identical requests in multi-defendant trials would inundate the courts and the prosecutor's office with requests which would serve no useful purpose. Once the prosecutor is on notice that certain materials are deemed sufficiently "material" to one co-defendant to require their production, his legal duty to provide those materials has crystallized, regardless of who the movant may have been. "Pretrial discovery," we have said in the past, "should be approached with a spirit of cooperation among court and counsel in order to prevent . . . burdensome recesses and also, we should emphasize, to protect the government against . . . claims of suppression of material and favorable evidence . . . ." United States v. Percevault, 490 F.2d 126, 132 (2d Cir. 1974). I would not limit a prosecutor's constitutional duty to disclose when his duty is brought home to him by any one defendant's request.